O’NIELL, J.
Plaintiffs, liquidators of the Prudential Savings & Homestead Society, appeal from a judgment dismissing their suit for $10,000 indemnity on a bond of a notary public on which the defendant company was surety. The suit was dismissed on an exception of no cause of action; the defendant’s contention being th,at the losses alleged to have been sustained by the homestead society, if such losses were incurred, did not result from any official misconduct of the notary public, but resulted from acts of forgery and embezzlement on his part.
The allegations of the petition, so far as they are pertinent to the question whether plaintiffs have alleged a cause of action, are as follows, viz:
“(2) On the 1st day of April, 1909, the said National Surety Company of New York, then as now doing business in this state under the laws thereof in reference to surety companies made and provided, became the surety for pay of one Thomas D. Plynn, then a notary public of this city, in which bond the said surety company bound itself in solido with the said Thomas D. Plynn to the extent of $10,000 that the said Thomas D. Plynn should faithfully and impartially perform and discharge all the duties incumbent upon him as a notary public of the parish of Orleans, and in accordance with the laws of the state of Louisiana, which provide that such bond shall secure all persons who may employ such notary public in his said profession, all as will more fully and at large appear by reference to a duly certified copy of the said notarial bond of the said Thomas D. Plynn, signed as surety by the National Surety Company of New York, hereto annexed and made part hereof and marked Exhibit A.
“(3) That the said Prudential Savings & Homestead Society, of which the petitioners are the liquidators (and which society was formerly called the Commonwealth Building & Loan Association, its name having been so changed by amendment to its charter passed before W. Morgan Gurley, notary public, on *589 October 31, 1913, duly recorded in M. O. B. 1119, folio 214), regularly employed the said Thomas D. Elynn as its notary public, he being regularly elected as such, and in his said capacity was authorized and empowered to pass all acts in which the said society should make loans to its stockholders upon the security of- the property tendered it by them to secure loans made them, and as such notary public it was his duty to receive the checks for the funds intended to be loaned such borrowers and to disburse the funds when the loans should be completed and to turn over to the said society the mortgage notes securing the said loans when completed.
“(4) Petitioner shows that the said Thomas D. Elynn was unfaithful to this trust as such notary public and became a defaulter and absconded from this city during the month of March, 1912, and he is at present out of the state of Louisiana and his whereabouts are unknown to petitioners.
“(5) Petitioners show that, while acting as notary public for the said Prudential Savings & Homestead Society, then called the Commonwealth Building & Loan Association, the said Elynn delivered over to the said society, in his capacity as notary public, the following described notes, purporting to be genuine vendor’s lien and privilege mortgage notes, viz.: [Here • follows a list and description of five promissory notes, each purporting to be secured by mortgage and vendor’s lien, and each paraphed by Elynn, as notary public, to identify it With an act of sale supposed to have been passed by him; the total amount of the promissory notes being $15,700. Then follows a description of two checks, aggregating in amount $5,400, alleged to have been collected by Elynn on forged indorsements of the name of the payee. The promissory notes and checks are said to be auniexed to the petition and made part thereof.]
“(6) Petitioners further show that the transactions mentioned in article 5 are only some of the transactions in which the said Elynn, acting in said capacity of notary public, victimized the said society by reason of his fraudulent acts as notary public, and they reserve the right, should it be held that the said surety on his notarial bond is not liable for any of the losses hereinabove detailed, to supply other losses than those so named.
“(7) Petitioners further show that all of the said notes detailed in article 5 were either forged, or, if not forged, no acts of sale and mortgage whatever were passed and recorded, as certified by the said Elynn to have been so passed, and with which acts said notes purported to be identified, under the official paraph of the said Elynn, as notary public, and because of the said notes not being genuine notes, or because no acts of sale and mortgage whatever having been passed to secure the said notes, the said society wholly lost the amounts hereinabove set forth; it in each instance having parted with the full face value of said note by payment of its funds therefor.
“(8) Petitioners further show that the said Thomas D. Elynn deceived the said society by informing it that the proposed borrowers had signed the said notes representing their respective loans, and that all proper signatures had been obtained to the several acts of transfer and resale, and the said society, not being aware of any of the fraudulent acts of the said Elynn, and in the usual and customary mode of handling said homestead transactions, relying entirely upon his integrity as a notary public, backed by his official bond, accepted the said notes, under his official paraph, in settlement of the purported loans made said parties, the chocks for which loans had been previously turned over to the said Elynn for disbursement in accordance with the custom of passing such homestead acts in this city, all of said checks, however, being made payable to the said respective borrowers.”
The two checks, amounting to $5,400, on which plaintiffs allege that the homestead society lost that amount, by Flynn’s forging the indorsement, cashing the checks, and embezzling the proceeds, may be disregarded, because the suit is for only $10,000, on a bond for that sum, and the mortgage notes, on which plaintiffs allege that the homestead society was defrauded by the notary’s false and fraudulent paraphs, amount to more than the sum sued for.
For the purpose of this decision, of course, the allegations of fact made in the petition must be accepted as true. We will therefore refer to the facts stated in the petition as if they had been proven.
[1] The only question to be decided is whether the contract by which Elynn defrauded the homestead society was in his official capacity as notary public, or merely in his individual capacity, in which any other individual might have committed the same *591 frauds. The argument on behalf of the surety company is that the checks on which Flynn forged indorsements, the proceeds of which he embezzled, were received by him as the agent of the homestead society, not as notary public, but as an individual employe of the society. Hence it is argued that, when the homestead society trusted Flynn with the checks, which were made payable to the prospective borrowers from the society, the latter assumed the risk that Flynn might forge indorsements on the checks and cash them and embezzle the proceeds, without resorting to any deceit or malpractice in his official capacity. as notary public. The argument, stated briefly, is that the surety company is released from liability for the official malpractice of the notary public, because the homestead society had voluntarily placed itself in such position, with respect to the notary public, that the latter might have defrauded the society without resorting to any official malpractice. The fallacy of the argument lies in the presumption that the notary public would have defrauded the homestead society if he had not been invested with the official capacity to cover up the fraud by using false certificates on promissory notes supposed to be secured by mortgage. In short, the flaw in the argument lies in the presumption that notaries public are not to be trusted as individuals; that one who trusts a notary public as an individual does so at his risk; and that money intrusted to a notary public in his individual capacity is presumed to be gone beyond recovery, from the moment when, the notary public received it as an individual or personal agent. On the contrary, money intrusted to a notary public, whether in cash or in the form of a bank check or other negotiable instrument, to be paid out by the notary in his official capacity and upon his performance of an official act as notary public, remains the property of the person who deposited it with the notary public, and the deposit so made is presumed to be safe. If the depositor be afterwards defrauded of his money by official malpractice of the notary public, as by issuing to the depositor a false notarial act, it cannot be said that the depositor’s loss occurred as soon as he made the deposit, or before the notary committed the fraudulent official act.
[2] The fact that the notary public in this ease was regularly employed as notary public by the homestead society did not deprive him of his official character, as notary for the homestead society, or make him merely an individual or personal employs of the society. To hold otherwise would release the surety on a notary’s bonds in almost all cases, because the victims of dishonest notaries public are generally persons who have employed a notary public to perform some official act. Under section 2503 of the Revised Statutes, the bond required of a notary public was “conditioned for the faithful performance of all duties required by law toward all persons who may employ him in his profession of notary.” The law, as amended by Act No. 42 of 1890, p. 34, by Act No. 138 of 1896, p. 217, and by Act No. 187 of 1902, p. 367, now makes the bond of a notary public for the parish of Orleans “conditioned as the law directs, for the faithful performance and' discharge of his duties as a notary public.” Prior to these amendments, there was a doubt as to whether the obligation of a notary’s bond should not be confined to those by whom a notary was employed as such. See Nolan v. Labatut, 117 La. 444, 41 South. 713. But there has never been any doubt that the obligation of the surety on a notary’s bond extended to all persons who might employ the notary public officially.
The exact question presented in this appeal has been decided by this court in at least three cases contrary to the contention of the surety company.
*593 In the case of Rochereau v. Jones, 29 La. Ann. 82, it was said:
“The sureties on the official bond of a notary public are liable for any loss or damage caused by his affixing his notarial paraph to any mortgage note which he knew to be forged. And any one injured by his act has a right of action on the bond against his sureties.”
In the case cited the notary public, William McO. Jones, in his individual capacity, sold to the plaintiffs two promissory notes which he, the notary, had forged, and which bore his official paraph, indicating that they were secured by an act of mortgage passed before him. The suit was to recover from the sureties the loss which plaintiffs had sustained by buying the forged and worthless notes. One of the defenses urged by the sureties was that the plaintiffs had bought the notes from Jones personally and in his individual capacity, and had not employed Jones to perform any official act as notary public. The court answered the argument by referring to Act March 12, 1857, No. 109, declaring the condition of a notary’s bond to be “that he shall faithfully perform his duties in that capacity.” As to whether the fraud practiced by the notary was committed personally or in his official capacity the court said:
“In matters of sales on terms, when notes are furnished by the vendor, what is the duty imposed on the notary? He shall attest each of the notes by putting Ms name on them, mentioning the date of the act from which the mortgage and privilege are derived, under the penalty of damages. R. C. C. 3384. That attestation, the notary’s name, his signature, those distinct and deceitful badges of simulated authenticity, are on the face of the discounted notes. The forgery is not that of an individual, but of the notary; his signature on those notes disguised and concealed the criminal fabrication, justified the conviction of their reality, left no room for suspicion and doubt, and was, as to the form and legal existence of those instruments, the principal, nay the only, cause which induced an acceptance of their transfer. Was not that forgery a violation of Ms official duty? If not, what would amount to or constitute such a violation?
“Had he not attached his signature to the attestation and Ms official capacity to Ms signature, however guilty he would have been, Ms sureties on his bond would not have been responsible. Had he discounted or sold notes forged by another notary, or by any one else but himself, he alone would have been liable. But can Ms sureties be released when the evidence establishes beyond contradiction that it was as a notary he forged the notes, as a notary that he forged the signature of the parties to the act, and that it was his signature as a notary that gave to those notes that form, that character, without which they could not have been converted into money? The attorneys representing appellants rely on decisions of this court reported in the Sixth and Sixteenth Annuals. Those decisions we adhere to. If interested parties deposit funds with a notary and he fails to account for those funds, his sureties are not liable; and why? Because,' as-Ms office is not one of deposit, he was trusted and received the deposit, not as an officer, but as an individual.”
The decision in Rochereau v. Jones, supra, was cited with approval in the case of Teutonia National Bank v. Wagner, 33 La. Ann. 737, in support of the doctrine there announced, which is very appropriate to the case before us, viz:
“The sureties of an officer are liable, not only for the acts done by him by virtue of his office, but also for those done under color or by moans of the office which he holds.” .
In the case of Stork v. American Surety Co., 109 La. 713, 33 South. 742, Mrs. Stork, a widow, had paid three mortgage notes which had been issued by her husban.d, and delivered the notes to a notary public to be canceled. The notary issued a receipt for the notes, saying they were received for cancellation, and signing the receipt officially. The notes were paraphed for identification with an act of mortgage that had been passed before another notary public. The notary who received the notes for cancellation did not have them canceled, but sold them to a third party, Spiro, and appropriated the proceeds *595 to his own use. Thereafter Spiro instituted foreclosure proceedings, and the property was seized and sold to satisfy the judgment obtained by him. Plaintiff thereupon brought suit against the surety company on the bond of the notary public who had embezzled her mortgage notes. The surety company urged defenses similar to those urged in the case before us. This court, by a unanimous opinion and decree, rejected the defenses, saying, with regard to the notary:
“Defendant’s principal on the bond was called upon as notary public by plaintiff to perform the duty of canceling the bond. He received her notes and bound himself as notary to see to their cancellation in the office of the recorder of mortgages.
“This would not bind the security on the bond, if, as contended by defendant, the duty, was not one of those which a notary could be called upon to perform. * * *
“As a notary in the case in hand, he held evidence of payment of the mortgage. As a notary, he had it in his power to require cancellation. Having failed to discharge the duties he had assumed in that capacity, the condition of his bond was broken. Had he issued a certificate of payment with th,e notes attached, or had he presented the note in person, as he should have done, the mortgage could, and doubtless would, have been canceled by the recorder of mortgages.
“The fact that the notary accepted the notes handed to him to have the mortgage canceled without the authentic deed, but assumed to perform the duty without it — a duty which he could perform with the notes in hand — cannot be construed, in our view, as a cause sufficient to release the security from all liability. * * * This plaintiff may have had too much confidence in this notary, but it does not appear that she was specially negligent. * * *
“Here the unfaithful agent took plaintiff’s money, and the absconding notary her notes— one and the same person. The money taken by him as agent is not claimed, for the very good reason that it was not and could not have been received by the notary as a notary, but by the agent.”
It appears from the record in the case last cited that the plaintiff had, besides trusting the notary public with-mortgage notes to be canceled, deposited money with him to be invested in mortgage notes., As to the money deposited with the notary for investment by him, the court said that the surety on his bond was not answerable for his having embezzled the funds; but, as to the notes intrusted with the notary for cancellation, the ruling was that he received the notes in his official capacity, and that his surety was answerable for his failure to have them canceled by the recorder of mortgages.
In the case of Harz v. Gowland et al., 126 La. 674, 52 South. 986, the plaintiff had bought from the notary public, Gowland, who acted in his individual and personal capacity, ten promissory notes which had been forged by Gowland, the notary, and had been paraphed by him as if to identify them with an act of sale and mortgage and vendor’s lien. No such act of sale or mortgage had been passed. Suit was brought against the notary and his surety in solido for the loss which the plaintiff sustained by the notary’s fraudulent dealings. It was held, in a unanimous opinion and decree, that the surety was liable. The court said:
“The question arises whether his surety is liable on his bond. We are of the opinion that it is. I-Ie, the notary, was acting in his official capacity, and in that capacity called upon the plaintiff and informed him, substantially, of the notes and of their validity, and stated where the property mortgaged was situated.
“As relates to the paraph ne varietur, there was nothing done or said to place the investor upon inquiry. The paraph is the official signature, and evidence of the reality and genuineness of the note on which it is written.”
The court then cited with approval Nolan v. Labatut, 117 La. 431, 41 South. 713. And, citing and quoting from the Rochereau Case, 29 La. Ann. 82, the court said:
“It must be borne in mind that in this decision the question rested on the fact that the paraph was a deception and a fraud, because the notary knew that the purported identification was not an identification because of the *597 fraud. ■ The same in substance is the case before us for decision.”
The defendant’s counsel cite and rely upon the decision in Lescouzeve v. Ducatel, 18 La. Ann. 470, Monrose v. Brocard, 20 La. Ann. 78, Schmitt v. Drouet, 42 La. Ann. 1064, 8 South. 396, 21 Am. St. Rep. 408, and Nolan v. Labatut, 117 La. 431, 41 South. 713.
The doctrine of the case of Lescouzeve v. Ducatel must be considered as having been overruled in Stork v. American Surety Company because the two cases are identically alike. In Lescouzeve v. Ducatel the ruling was that the law had not made it the official duty of a notary public to receive money to have a mortgage canceled, and that therefore, the surety on the notary’s bond was not liable for his neglect or failure to have a mortgage canceled, for the cancellation of which he had received the amount of the mortgage debt from the mortgagor, with instructions to cancel the mortgage.
The case of Monrose v. Brocard and the case of Schmitt v. Drouet were referred to in the opinion rendered in Stork v. American Surety Company, supra, and were declared to be not in conflict- with the doctrine there announced. If they were in conflict with the latter decision, therefore, they must be considered as having been thereby overruled.
The decision in Nolan v. Labatut, on rehearing, 117 La. 431, 41 South. 713, was by a divided court. Two members of the bench, as then constituted dissented. The opinion of the majority was that the surety was not liable for the notary's acts of fraud in issuing notes forged by him and paraphed by him as if identifying them with acts of mortgage, because the notes were received by the plaintiff in discharge, or in partial discharge, of the notary’s indebtedness as agent, for money which he had previously collected for plaintiff’s account. The surety was held liable, however, by unanimous opinion and decree, for a loss of $600 which plaintiff had sustained by purchasing for cash from the notary a note for that sum which the notary had forged and falsely paraphed.
In the opinion in Nolan v. Labatut the court cited and distinguished from the case then in hand the decision in Stork v. American Surety Co., supra, and said that the difference between the two cases was in the facts, and not in the court’s views upon the questions of law. The doctrine of the case of Stork v. American Surety Co., therefore, was not overruled. Not being required here to either affirm or disavow all that was said in Nolan v. Labatut, it is sufficient to say that the facte in the case before us are more nearly like the facts in Stork v. American Surety Company than like the facts in Nolan v. Labatut; for in the case before us the checks which the notary forged and cashed and embezzled the proceeds of were not deposited with him to be invested by him as the agent of the plaintiff.
[3] It is argued by counsel for the surety company that the homestead society could not have been defrauded or deceived by the notary public, Flynn, in the manner alleged in the petition, because, in making loans, the homestead society invariably took title from the borrower and immediately resold the property to him. The argument, in other words, is that any officer of the homestead society who received from the notary public promissory notes which the latter pretended were secured by mortgage and vendor’s lien must have known whether the acts of sale had really been passed. We are not so sure that the notary public could not have practiced a deception or fraud as well by pretending to have passed an act of sale and resale as by pretending to have passed an act of mortgage. The argument of the surety company’s attorney in that respect is one which may be pertinent when the case shall *599 have been tried upon its merits; but the argument is not applicable to the exception of no cause of action.
[4] Defendant’s counsel also filed in the district court pleas of prescription of one year and of three years, and from the fact that the judge’s decree was “that said exceptions be maintained,” the inference is that the pleas of prescription, as well as the exception of no cause of action, were maintained.
We see no merit whatever in the plea of prescription of three years, which applies to an open account; and counsel for the surety company do not insist upon the plea. As to the prescription of one year, it is sufficient to say that this court has at least four times decided that the plea does not apply to a case like this.
In Brigham v. Bussey, 26 La. Ann. 676, it was held that an action against the recorder of mortgages and the surety on his bond for damages resulting from his failure of official duty was an action ex contractu, not subject to the prescription of one year. The same ruling was made in Fox v. Thibault, 33 La. Ann. 32. In Weintz v. Kramer, 44 La. Ann. 35, 10 South. 416, it was said:
“The prescription of one year is not applicable to an action brought upon the bond of a notary public for failure to perform the duties incumbent upon him.”
The two decisions last cited were quoted with approval in Gordon v. Stanley, 108 La. 187, 32 South. 531.
Our conclusion is that the pleas of prescription should have been overruled.
The judgment appealed from is annulled, the exception of no cause of action and the pleas of prescription of one year and of three years are overruled, and it is ordered that the case be remanded to the civil district court for further proceedings not inconsistent with the foregoing opinion. The defendant, appellee, is to pay the costs of this appeal. All other costs are to depend upon the final judgment.
MONROE, O. J., dissents.